Michael J. CECERE, III, Christine A. Nagy, William Odol, Carolyn Delvecchio and Donald V. Pupke, Jr., Plaintiffs,

v.

THE COUNTY OF NASSAU, the Nassau County Legislature, Judith Jacobs, as Presiding Officer of the Nassau County Legislature, and Nassau County Board of Elections, John A. Degrade, in his official capacity as a Commissioner of the Nassau County Board of Elections, Eric. S. Brown, in his official capacity as a Commissioner of the Nassau County Board of Elections, Defendants.

No. 03–CV–1548 (DRH).

United States District Court, E.D. New York.

April 23, 2003.

Rivkin Radler LLP, Uniondale, NY By Evan H. Krinick, for Plaintiffs.

Lorna B. Goodman, Nassau County Attorney, Mineola, NY By Jeffrey M. Wice, David B. Goldin, for Defendants.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending before the Court is plaintiffs' motion for expedited discovery.

*FACTS*

On February 27, 2003, the Nassau County Legislature adopted a county legislature redistricting plan based upon the 2000 decennial census data, Local Law 2–2003. County Executive Thomas Suozzi signed that law into effect on February 28, 2003.

By complaint filed April 1, 2003, five individual "citizen[s] of the United States of America and the State of New York" who reside in various Nassau County districts, brought suit against the County, the County Legislature, Judith Jacobs as Presiding Officer of the Legislature and the Board of Elections and its Commissioners. Compl., ¶¶ 2–6. The relief sought includes:

1. a declaration by this Court that L.L. 2–2003 is in violation of the Fourteenth Amendment to the United States Constitution, Article I, § 1 of the New York State Constitution, Article I, § 11 of the New York State Constitution and § 112 of the Nassau County Charter;

2. a permanent injunction enjoining any election to take place in Nassau County under L.L. 2–2003; and

3. a permanent injunction compelling the defendants to adopt a redistricting plan that satisfies all constitutional and statutory guidelines with all deliberate speed.

*Id.* at p. 36.

Expedited discovery is sought because "due to the upcoming November 2003 legislative elections, and the statutorily imposed political calendar leading up to the November 2003 election, it is imperative that plaintiffs be able to expeditiously garner all the necessary facts," lest they lose "their fundamental right to vote." Pls.' Mem. Supp. at 5.

*STANDARD FOR DETERMINING MOTION FOR EXPEDITED DISCOVERY*

■ Among the factors to be considered in determining an application for expedited discovery are the following:

(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury [that] will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*Gidatex, S.R.L. v. Campaniello Imports, Ltd.,* 13 F.Supp.2d 417, 420 (S.D.N.Y.1998) and cases cited therein; *see also* Pls.' Apr. 15, 2003 Letter Br. at 1 indicating that *Gidatex* provides the appropriate standard.

*DISCUSSION*

1. *Applicable Law*

a) Guarantee of "One Person, One Vote"

■ The equal protection guarantee of "one person, one vote" was first articulated by the Supreme Court in *Gray v. Sanders,* 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The Supreme Court has applied the guarantee to congressional districts, as well as state and local election districts. *Daly v. Hunt,* 93 F.3d 1212, 1216–17 (4th Cir.1996). However, the principle is applied less stringently in state and local redistricting matters than is true for congressional reapportionments. *See, e.g., Gaffney v. Cummings,* 412 U.S. 735, 741–42, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Mahan v. Howell,* 410 U.S. 315, 321, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Abate v. Rockland County Legislature,* 964 F.Supp. 817, 819 (S.D.N.Y.1997) and *Marylanders For Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1030–31

(D.Md.1994). As explained in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), States are required to "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Id.* at 577. Which is to say, although "absolute population equality should be the paramount objective in plans allocating congressional districts ..., the Court affords more flexibility to States in formulating districting plans for state legislative seats by requiring only 'substantial' population equality." *Marylanders For Fair Representation,* 849 F.Supp. at 1030 (citing *Karcher v. Daggett,* 462 U.S. 725, 732–33, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) and *Gaffney,* 412 U.S. at 748, 93 S.Ct. 2321). "This slightly relaxed requirement for state redistricting plans recognizes that minor deviations from absolute population equality may be necessary to permit the states to pursue other legitimate state policies." *Marylanders For Fair Representation, Inc.,* 849 F.Supp. at 1030.

▪ Indeed, all that is required with respect to state and local redistricting efforts is that the resulting plan produces " 'substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.' " *Gaffney,* 412 U.S. at 744, 93 S.Ct. 2321, (quoting *Reynolds,* 377 U.S. at 579, 84 S.Ct. 1362).

▪ In an effort to quantify the "substantial equality of population" requirement for state and local redistrictings, the Supreme Court has developed a rule that a maximum population deviation rate of 10 percent or above creates a prima facie case of discrimination whereas a rate under 10 percent is, "as a general matter," deemed to be a "minor deviation." *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983).

b) Local Law 2–2003 Has a Maximum Population Deviation Rate of Under 10 percent

Rocco A. Iannarelli, Clerk of the Nassau County Legislature, avers that the "redistricting of the Nassau County Legislature into 19 legislative districts ... has an overall population deviation of 8.93 percent (from the population of the smallest district to that of the largest."). Iannarelli Aff. at ¶ 22.

During oral argument, plaintiffs acknowledged that the rate is below 10 percent. Yet, they proffer that their expert produced an alternate plan with a maximum deviation rate of approximately 4 percent, thereby suggesting that Nassau County was required to do more. However, "[t]he Supreme Court has expressly rejected the argument that the possibility of drafting a 'better' plan alone is sufficient to establish a violation of the one person, one vote principle." *Daly,* 93 F.3d at 1221 (citing *Gaffney* ). Indeed, the *Gaffney* Court stated that judicial involvement in the inherently legislative process of apportionment " 'must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally "better" when measured against a rigid and unyielding population-equality standard. The point is, that such involvements should never begin.' " *Id.* (quoting *Gaffney,* 412 U.S. at 750–51, 93 S.Ct. 2321).

2. *Pivotal Issue Before the Court*

Of the four factors to be considered in determining a motion for expedited discovery, the pivotal factor for present purposes is number 2, to wit, that movant has demonstrated "some probability of success on the merits." Defendants, in opposing the requested relief, claim that plaintiffs' attack on the redistricting plan is deficient as a matter of law because the deviation

rate is under 10 percent. In that regard defendants recognize, as they must, that a maximum deviation rate under 10 percent would not immunize a redistricting plan if, for example, it "fences out a racial group so as to deprive them of their pre-existing municipal vote." *Gaffney*, 412 U.S. at 751, 93 S.Ct. 2321.

At oral argument, however, plaintiffs explained that they are not advancing a claim that Local Law 2–2003 is invalid because it discriminates against individuals falling within a protected class, or is the product of impermissible political gerrymandering. Instead, the sole basis for plaintiffs' attack is that the local law impermissibly dilutes their voting power as residents of some of the more populous districts.

Plaintiffs counter by arguing that there is no judicially recognized per se principle, and that the 10 percent rule pertains only to the burden of proof, i.e. if the rate is over 10 percent, the municipality must justify the deviation; if it is under 10 percent, plaintiffs carry the burden of proof and are confronted with the presumption that the plan is constitutional.

### 3. *Court's Analysis*

■ Plaintiffs' memorandum of law in support of their motion for expedited discovery speaks of the "Democratic majority of the Nassau County Legislature ... carv[ing] up Nassau County with a singular purpose of creating the most partisan map possible." Pls.' Mem. Supp. at 3. To accomplish that purported goal, it is opined that the Democratic majority resorted to an "arbitrary and discriminatory process [which] bizarrely shaped districts which split long standing communities, while at the same time joining community's with no common interest." *Id.* However, during oral argument the political gerrymandering issue was jettisoned perhaps because, even assuming its factual legitimacy, such an effort by the Demo-

crats to "redistrict[ ] with a specific intention of disadvantaging one political party's election prospects" does not, alone, run afoul of the Equal Protection Clause. *See Davis v. Bandemer*, 478 U.S. 109, 138–39, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).

■ It also warrants underscoring that plaintiffs have submitted no proof, by affidavit or otherwise, tending to support the assertions in their memorandum of law regarding the supposed misshapen communities embodied in the challenged redistricting plan. The allegations in the complaint, without more, do not serve as a legitimate predicate for expedited discovery. Simply put, movants have failed to establish that they have "some probability of success on the merits," notwithstanding the relative *de minimis* nature of that standard. Accordingly, the Court declines to order expedited discovery.

In reaching the above conclusion, the Court considered whether Local Law 2–2003's low deviation rate renders plaintiffs' claim of improper dilution of their voting power insufficient as a matter of law. A credible argument may and, indeed has been advanced by defendants, that such is the case. Thus, in Justice Brennan's dissent in *Brown v. Thomson* it is explained:

> "Our cases since *Reynolds* have clarified the structure of constitutional inquiry into state legislative apportionments, setting up what amounts to a four-step test. First, a plaintiff must show that the deviations at issue are sufficiently large to make out a prima facie case of discrimination. We have come to establish a rough threshold of 10% maximum deviation from equality (adding together the deviations from average district size of the most underrepresented and most overrepresented districts); below that

level, deviations will ordinarily be considered *de minimis.*"

462 U.S. at 852, 103 S.Ct. 2690.

Language in *Gaffney* also tends to support defendants' position. There, the Supreme Court reversed a determination by a three judge district court panel which had invalidated a reapportionment plan for the Connecticut Assembly. In doing so, the Court emphasized that redistricting "is primarily a political and legislative process" (412 U.S. at 749, 93 S.Ct. 2321) and held that a reapportionment plan with a maximum population deviation rate of approximately 8 percent was constitutional.

In *Fund For Accurate and Informed Representation, Inc. v. Weprin,* 796 F.Supp. 662 (N.D.N.Y.1992), a three judge panel found that plaintiffs' concession that the maximum population deviation rate in the reapportionment plan for the New York State Assembly was 9.43 percent was "fatal to the one person, one vote claim...." *Id.* at 668. As stated by the panel "absent credible evidence that the maximum deviation exceeded 10 percent, plaintiffs failed to establish a prima facie case of discrimination ... sufficient to warrant further analysis by this court," citing the Supreme Court's decision in *Brown. Id.*

However, in each of the above cases, and like decisions cited by the parties, the courts have stopped short—with the exception of the panel in *Fund For Accurate and Informed Representation*—of labeling 10 percent as a line of demarcation beneath which a dilution claim is per se insufficient. For instance, Justice Powell,

in delivering the opinion for the Court in *Brown,* stated: "Our decisions have established, *as a general matter,* that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." 462 U.S. at 842, 103 S.Ct. 2690 (emphases added).

Reference to *Daly v. Hunt,*—cited by both parties in support of their respective, but divergent views—favors plaintiffs' position. Daly and his co-plaintiffs, like the plaintiffs here, alleged that the challenged "voting districts violate[d] the one person, one vote principle because the populations of the district are not sufficiently equal." *Id.* at 1214.

The lower court granted plaintiffs' cross-motion for summary judgment and enjoined defendants from conducting elections under the plan.[1] In vacating that termination and remanding the case to the district court, the Circuit explained:

The Circuit in *Daly* explained that

"[I]f the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness. To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination....' In other words, for deviations below 10% the state is entitled to a presumption that the apportionment plan was the result of an 'honest and good faith effort to construct the districts ... as nearly of equal population

---

1. Plaintiffs' *other* argument in *Daly* was that defendants should have utilized the voting-age population, rather than the total population, in formulating the redistricting plan. The district court adopted that argument, found that the resulting deviation rate exceeded 10

percent, and invalidated the plan. *Daly v. Hunt,* 93 F.3d 1212, 1216 (4th Cir.1996). Parenthetically, the Circuit found that the district court's utilization of the voting-age population approach constituted error. *Id.* at 1228.

as is practicable....' However this is an rebuttable presumption."

*Id.* at 1220.

In sum, although *Daly* has language which favors the position urged by defendants, its holding, including the remand to permit plaintiffs to endeavor "to establish that the apportionment plan at issue was the product of bad faith, arbitrariness, or invidious discrimination," supports plaintiffs' interpretation of the case. *Id.* at 1222. Needless to say, if plaintiffs' dilution claim was insufficient as a matter of law given that the maximum population deviation rate was less than 10 percent, a remand to determine whether the redistricting plan was the product of, inter alia, arbitrariness would not have occurred.

Finally, the Court considers *Marylanders for Fair Representation, Inc.,* in which a three judge panel, after carefully analyzing the cases cited by the litigants on the issue of whether a plan with a deviation rate under 10 percent was *ipso facto* constitutional, concluded that it was not and held:

> "[A] plaintiff could, with appropriate proof, successfully challenged a redistricting plan with a maximum deviation below 10 percent. To prevail, though, the plaintiffs have the burden of showing that the 'minor' deviation in the plan results solely from the promotion of an unconstitutional or a irrational state policy."

*Id.* at 1032.

Although plaintiffs have carried the day, at least on the information and cases thus far provided to the Court, in their argument that the mere fact that the maximum deviation rate under Local Law 2–2003 is less than 10 percent does not bar their constitutional challenge, they have, as previously explained, failed to make a sufficient showing to warrant expedited discovery.

*CONCLUSION*

Plaintiffs' motion for expedited discovery is denied.